416 F.Supp. 388 (1976)
HAWKINS CONSTRUCTION COMPANY, a corporation, and Aetna Casualty & Surety Company, a corporation, Plaintiffs,
v.
FIRST FEDERAL SAVINGS & LOAN ASSOCIATION, a corporation, Defendant.
Civ. No. 74-24-W.
United States District Court, S. D. Iowa, W. D.
June 1, 1976.
On Motion to Vacate June 15, 1976.
*389 John R. Douglas, Omaha, Neb., and David F. McCann, Council Bluffs, Iowa, for plaintiffs.
Thomas J. Walsh, Omaha, Neb., and C. Adam Schulte and John W. Logan, Council Bluffs, Iowa, for defendant.

MEMORANDUM AND ORDER
HANSON, Chief Judge.
This case involves a claim by the plaintiffs for equitable contribution from the defendant following a negative judgment sustained by the parties in a state court proceeding. The defendant, by way of denial, asserts its paramount right to full indemnification protection by the plaintiffs for the judgments entered in the state court proceeding. The case is before the Court on stipulation of fact and following a hearing.
The plaintiffs are Hawkins Construction Company (Hawkins) and its insurer, Aetna Casualty & Surety Company (Aetna). Hawkins is a corporation created under the laws of the State of Nebraska and has its principal place of business in Omaha, Nebraska. Aetna is a corporation existing under the laws of, and having its principal place of business in, Connecticut. The defendant is First Federal Savings & Loan Association (First Federal), a corporation under the laws of Iowa with its principal place of business in Council Bluffs, Iowa.
Jurisdiction is based on diversity of citizenship, the amount in controversy exceeding $10,000 exclusive of interest and costs. 28 U.S.C. § 1332 (1970).

FACTUAL DEVELOPMENT
In the summer of 1966, First Federal, desirous of constructing a multiple-story office building on its property in Council Bluffs, Iowa, contracted with American Wrecking Company to provide initial demolition, clearing and evacuation work. The property adjoined the westerly boundary of the Wollman Building. At that time the Wollman Building was owned by Sloan and Clarke, and the Barneses were tenants under lease in the building.
*390 Following the initial clearing and light excavation work, the property was permitted to remain partially excavated until August of 1967, during which time substantial amounts of water collected in the property and First Federal took no measures to protect the property.
On August 10, 1967, First Federal executed a contract with Hawkins, a general contractor, to finish the excavation work and construct the new multiple-story building. Hawkins, in July of 1967, inspected the premises and adjoining buildings. Under the terms of the contract, Hawkins accepted the construction site in its then existing condition. Hawkins further agreed to indemnify and hold First Federal harmless for claims arising from prosecution of the project. Aetna was Hawkins' surety on the indemnification bond.
In mid-August, Hawkins commenced work by extending the excavation to the Wollman Building boundary and, in late August, began pile-driving operations. In early September, substantial cracks appeared in the foundation of the Wollman Building. This required considerable shoring and bracing work by Hawkins prior to resumption of pile-driving operations.
Subsequently, suit was brought by Sloan, Clarke and the Barneses in the District Court for Pottawattamie County predicated upon the negligence of First Federal and Hawkins, and upon Hawkins' breach of its contract with First Federal of which the Wollman Building owners and tenants were third-party beneficiaries. Following a bench trial, the state court rendered judgment against both Hawkins and First Federal on the negligence theory and against Hawkins on the third-party beneficiary theory. The state court also entered extensive findings of fact and conclusions of law which are controlling in this case. The pertinent portions of that decision are hereinafter set forth:
The evidence is that the razing of the old buildings and the partial excavation on the First Federal site was completed in September of 1966. This work exposed the West foundation wall of the Wollman Building; . . .. Mr. Joe Moritz, job sponsor for Hawkins first saw this site about July 1, 1967, and observed this excavation was 10 to 15 feet below street level and generally sloped East. Substantial surface water collected and was permitted to remain in this partial excavation. No measures for the protection of the soil adjacent to the Wollman Building were taken by First Federal and the soil was exposed to the effects of weather and climate through four seasons. For a substantial part of that time much water collected in the excavation. The testimony of Mr. Latenzer, a qualified and experienced structural engineer with special familiarity with soil characteristics in this area, was that the soil here involved at the foot of the loess bluffs, was plastic, adversely affected by excessive moisture and crumbly on drying. The tendency of this soil to slough off is demonstrated in the photo Exhibit 86 showing the soil under the Broadway sidewalk, where there was no substantial superimposed building load, confirming the testimony of Mr. Latenzer that the exposed soil would slough even if there were no building on it. This witness also admonished that one of the first requisites of care in protection of adjoining property was to keep the excavation pumped out so no water collected and remained, and to protect the soil from exposure to the elements. No evidence was presented by the defendant First Federal denying the adverse affects of collected water, exposure and weather on the support of the soil adjacent to the Wollman Building west wall as a part of the foundation system of that wall. In January of 1967, the tenant Barnes reported a small crack in the southwest wall of the Wollman Building. After construction began, what appears to be this same crack, became substantially larger indicating to the Court that the damage process to foundation system attributable to excavation, collected water and exposure had commenced.
The very serious damage to the West wall of the Wollman Building appeared *391 after the defendant Hawkins commenced Phase II construction under the contract with First Federal. Hawkins Construction Company is an experienced general contractor engaged in industrial, commercial, institutional, and heavy construction in Nebraska and Iowa, and has had extensive work in the Omaha and Council Bluffs areas. Its personnel who appeared as said witnesses are qualified and knowledgeable.
The record establishes that both Mr. Fred Hawkins, President of Hawkins Construction Company, and Mr. Joe Moritz had examined the site and the West wall of the Wollman Building. The specifications, . . ., contain admonitions on the age of this building, the condition of the West wall, and the absence of any pad or spread footing under the wall. Hawkins was sufficiently concerned to take photographs of the cracks in that wall, and it was apparent to the Hawkins personnel that the building had endured a fire and they observed mortar between the bricks at the top of the wall was dead and bricks were loose.
Mr. Moritz testified that August 19, 1967, . . ., was the day the first Hawkins equipment was on the job. First Hawkins excavated the site to approximately 11 feet below the sidewalk line. . . . A plan, . . . varying from the specifications was prepared by Mr. Moritz on August 20, 1967, for moving the protective sheet piling to 5 feet from the West wall of the Wollman Building so that the sheet piling could be used as the outside form of the East basement wall of the First Federal Building. . . . Mr. Moritz testified they were in place about August 26 to 28. Two test piling had been driven to refusal on August 24.
* * * * * *
Sheet piling is one of the methods used by builders in the exercise of care to protect the soil along the line of and under adjacent structures, but it serves this purpose only if it confines and is against the supporting soil. This void between the sheet pile and the Wollman wall was not backfilled by Hawkins until September 1 when sand was placed between the sheet piling and the wall, sloped, and capped with a weather protective concrete slurry because the weather forecast was for rain. The day following, dirt was pushed up against the West side of the sheet piling. Mr. Fred Hawkins vouched for the virtues of sheet piling as a recognized and approved method of retaining soil so that dirt does not move away. As used in this instance, it could not do so because of the void between the pile line and the foundation of the Wollman wall.
The architects and engineers of First Federal, Henningsen, Durham & Richardson, recognized that pile driving is "potentially dangerous work" requiring "utmost care so as not to endanger life and property". Nebraska Testing Laboratories soil report made a part of the specifications, . . ., expresses the conclusion "Pile-driving adjacent to the brick wall would be detrimental to the stability of the wall, especially if no measures were taken to provide support other than presently exist". Mr. Ness Latenzer expressed the opinion that pile driving could be detrimental to the wall. Mr. Pennebaker and Mr. Hammon, the latter a vibration damage specialist, essentially testified the pile driving vibrations were in the safe zones by building industry standards, but neither related these standards to the soil and wall conditions or the protective measures situation in the instant case. After an extensive review of the condition of the building, Mr. Hammon expressed his surprise that the wall didn't settle more than it did. It is the finding of the Court that the pile driving in the absence of effective protective measures was at least detrimental to the wall.
Division II of the petitions in all three cases is based upon provisions in the contract between First Federal and Hawkins. These are Sections 13 and 15 of General Conditions . . . as follows:

*392 13. PROTECTION OF PROPERTY The Contractor shall, at no additional expense to the Owner, Protect by false work, braces, shoring or other effective means, all buildings, foundations, walls, fences and other property along his line of work or affected directly by his work, including in part the Owner's property, against damage and shall repair the damages or repay the injured Owners if such damage occurs.
15. USE OF EXPLOSIVES, DRIVING OR REMOVAL OF PILES, WRECKING, EXCAVATION WORK OR OTHER SIMILARLY POTENTIALLY DANGEROUS WORK. When the use of explosives, driving or removal of piles, wrecking excavation work or other similarly potentially dangerous work is necessary for the prosecution of the work, the Contractor shall exercise the utmost care so as not to endanger life or property. The Contractor shall be fully responsible for any and all damages, claims and for the defense of all actions against the Owner resulting from the prosecution of such work in connection with or arising out of the contract.
The plaintiffs in Case No. 4108, Sloan, et al., plainly are owners of property along the constractors line of work and affected directly by his work. Plaintiffs Barnes in Case No. 42637 are the owners of property in the nature of fixtures and equipment in the Wollman Building, of a leasehold interest in that building, and leasehold improvements to that building. The property damages in both of these cases is within the broad classification of what is to be protected by the Contractor. Clearly these provisions of the contract are third party beneficiary provisions, and as related to the premises at 413 West Broadway the plaintiff parties are within the class of protected persons. . . .
The substantial damages to the building at 413 West Broadway first appeared September 1, 1967, . . . Mr. Latenzer described the wall as being "in trouble" at that time. The conclusion appears to have been that the building was not safe for occupancy for business purposes. A system of monitoring further movement in this wall by plaster patches bridging the void of the cracks was set by both Hawkins and by F. W. Mann, a professional engineer, for the plaintiffs Sloan, et al, because hazards to the wall and to Hawkins personnel in the adjoining worksite remained. Movement of the wall continued for 10 days to 2 weeks, and then became minimal. Shoring to brace the West wall was placed against it by Hawkins in the period September 12th to 19th, and pile driving was resumed September 21st. On September 22nd, the Hawkins job foreman reported noise and movement in the wall, and work was suspended until Hawkins had installed steel scaffolding in the Wollman Building to support the floors and in the entrance. The building was barricaded with a snow fence. Work on the First Federal Building was resumed thereafter. The steel scaffolding is still in the building. Except for the obligation of the foregoing Sections 13 and 15, the installation of the shoring and scaffolding by Hawkins appears to have been voluntary and not the result of any request or demand of the plaintiffs, and as much in the interest of Hawkins in the protection of its worksite and workmen as in the interests of the plaintiffs Sloan, et al. The Court finds that as to the plaintiffs Sloan, et al, and as to the plaintiffs Barnes in respect to its leasehold interest, leasehold improvements and fixtures in 413 West Broadway is concerned, there was a breach of the contract General Conditions, and the above Sections 13 and 15, by Hawkins in its failure to protect by effective means, to repair the damages or repay the injured owners, to use the utmost care, and to be fully responsible for any and all damages.
The defense of the defendants is that the Wollman Building lacked "structural integrity" both as related to the issue of proximate cause under Division I and natural and probable consequence under *393 Division II. No doubt the building was an old building, but the defendants knew this fact, and by the terms of the Contract, . . ., and the Specifications, . . ., Hawkins is charged with this knowledge that there was no projection outward from the wall surface as a pad footing. Even though the wall had no spread footing, it had a foundation. Both Mr. Moritz and Mr. Hawkins visited the site before bidding on the job and knew the building was an older building with many vertical cracks in the West wall. Defendants knew the building had been through a fire. The roof and second floor were restored with new construction, and in the words of the witness, John Burrows, the West wall was "doing its job." . . .
* * * * * *
Most persuasive to the Court are the undisputed facts that the many cracks of indeterminate age in that West wall did not change in the wall movement on or about September 1, 1967, and afterwards, that the movement apparent in the interior was a downward and outward movement of the wall largely in its entirety. The wall did not crumble or buckle. The Wollman wall did perform its function without any serious problems until Hawkins deepened the excavation, drove sheet piling one foot seven inches farther away from the soil slope, didn't blackfill to confine the soil slope, didn't protect the slope from weather, drove piling without adequate protective measures such as shoring. These facts bear out the opinion evidence of Mr. Latenzer that the failure of the foundation system of the West wall for want of usual precautions caused the movement in the West wall and the consequent damages.
* * * * * *
The defendant Hawkins asserted a counter-claim against the plaintiffs in Case No. 41048 apparently predicated upon some primary duty resting on the owners of the Wollman Building to protect the building and the workmen and worksite of Hawkins. Division I seeks recovery of Hawkins' costs for protective work and Division II seeks indemnity for any recovery by the plaintiff Barnes as a tenant of 413 West Broadway. The allegations of the Counterclaims are denied. . . . Apart from its contract obligations under Paragraphs 13 and 15 of the Specification, . . ., Hawkins voluntarily installed the shoring and interior bracing. Moreover, this protective work was done after the substantial damage to the Wollman Building had been done, and at that stage was primarily to protect the employees of Hawkins and the job-site. . . .
* * * * * *
CONCLUSIONS OF LAW
The Court upon the foregoing findings of fact has concluded as follows:
1. That First Federal was negligent.
2. That Hawkins was negligent.
3. That such negligence of both defendants was the proximate cause of the damage of the Wollman Building, suffered by plaintiffs Sloan et al in Case No. 41048, and to certain fixtures and equipment suffered by plaintiffs Barnes in Case No. 42637.
* * * * * *
8. That Paragraphs 13 and 15 of General Conditions, . . ., are contractual obligations binding on the defendant Hawkins in favor of and for the benefit of third parties, and the plaintiffs Sloan et al in Case No. 41048 and the plaintiff Barnes in Case No. 42367 as related to the leasehold interest, leasehold improvements, and fixtures in 413 West Broadway only are within the class of persons to be benefitted and protected by such provisions. That the defendant Hawkins breached these contractual provisions, and is liable to the third party beneficiaries for such breach of contract.
* * * * * *
10. That the damages in both Case No. 41048 and Case No. 42637 are the natural, probable, and reasonably foreseeable *394 consequences of the breach of contract.
* * * * * *
Hawkins and its insurer, Aetna, retained counsel to represent their interests and, pursuant to the indemnification provisions, the interests of First Federal.[1] All parties were kept apprised of developments in the case by Hawkins' retained counsel. Then, following the state court decision but shortly before the deadline for appeal of the state court decision, Aetna informed First Federal and its insurance carrier, Underwriters Adjusting Company, that Hawkins and Aetna considered First Federal responsible for one-half of the judgment and costs of defending the suit. In a series of correspondence, First Federal indicated surprise at this decision, and denied any responsibility by claiming that the contract indemnity clause and Aetna's defense of the lawsuit estopped Hawkins and Aetna from seeking contribution. No appeal was taken from the state court judgment, and the parties did not petition the state court for a determination of liability among the parties. Instead, Hawkins and Aetna paid one-half of the judgment. Thereafter, Aetna and Hawkins were forced to pay the remaining one-half of the judgment amount when the state court plaintiffs attached Hawkins' property.
The instant lawsuit was filed by Hawkins and Aetna seeking equitable contribution from First Federal. Plaintiffs proceed on the theory that, since the parties were found negligent in pari delicto, they are entitled to recover for the excessive amount paid on the judgment, i. e., one-half of the judgment and costs of the suit. First Federal, however, claims the protection of the contractual indemnity provisions, and alternatively, claims that it is entitled to common law indemnity. Finally, First Federal argues that since Aetna and Hawkins controlled the course of the state court proceedings, they are estopped to request contribution.

LEGAL CONCLUSIONS
The determinative issue before the Court is whether First Federal is entitled to contractual or common law indemnity thereby precluding the plaintiffs' request for equitable contribution.[2]
Initially, the Court notes that this case is controlled by the substantive law of Iowa. Chicago Great Western Ry. Co. v. Farmers Produce Co., 164 F.Supp. 532, 536 (N.D. Iowa 1958). Furthermore, the Court and the parties recognize that the judgment, findings and legal conclusions of the Pottawattamie County District Court are binding and conclusive in this case. Id. at 536-37.
The Court also realizes the posture of this case is somewhat unusual. In most cases, the right to indemnity is asserted as an affirmative cause of action, not as a defense. However, as the Supreme Court of Iowa recognized in Stowe v. Wood, 199 N.W.2d 323, 326 (1972), the right to indemnity can operate as a bar to an indemnitor's claim for contribution.
The contours of an obligation to indemnify another have been frequently defined under Iowa law. In Hysell v. Iowa Public Service Company, 534 F.2d 775 (8th Cir. 1976), the Eighth Circuit stated:
Iowa law recognizes several theories on which indemnity may be permitted: (1) express contract; (2) vicarious liability; (3) breach of an independent duty between the indemnitor and the indemnitee; and (4) the primary or "active" tortious conduct of the indemnitor as compared to the secondary or "passive" tortious conduct of the indemnitee. See Mayhew v. Iowa-Illinois Telephone Co., 279 F.Supp. 401, 403 (S.D.Iowa 1967); Iowa Power and Light Co. v. Abild Construction *395 Co., 259 Iowa 314, 322-23, 144 N.W.2d 303, 308 (1966). See generally, D. Furnish, Distributing Tort Liability: Contribution and Indemnity in Iowa, 52 Iowa L.Rev. 31, 34-35 (1966). Of these four grounds for indemnification, the first three are based upon a relationship existing between indemnitor and indemnitee, while the fourth ground is based solely on a common liability arising from the concurrent negligence of these parties. Id. at 782.
In this case, First Federal is relying upon contractual indemnity and common law or implied indemnity. Reliance on one theory does not foreclose reliance on the other. Epley v. S. Patti Construction Company, 228 F.Supp. 1 (N.D.Iowa 1964), rev'd on other grounds, 342 F.2d 830 (8th Cir. 1965); Chicago Great Western Ry. Co. v. Farmers Produce Co., supra, 164 F.Supp. at 537.

A. CONTRACTUAL INDEMNITY
First Federal initially contends the sum content of the August 10th contract with Hawkins provides complete indemnification for the judgment and suit costs in the state court proceeding. The critical provisions of that contract are as follows:

1. CONTRACTOR'S UNDERSTANDING. It is understood and mutually agreed that by submitting a proposal the bidder acknowledges that he has carefully examined all documents pertaining to the work, the location, assessibility, and general character of the site of the work and all existing buildings and structures within and adjacent to the site, and has satisfied himself as to the nature of the work, the conditions of existing buildings and structures, the conformation of the ground, the character, quality and quantity of the material to be encountered, the character of the equipment and facilities needed preliminary to and during prosecution of the work, the general and local conditions, the construction hazards, and all other matters, including but not limited to the labor situation which can in any way affect the work under this Contract. It is further mutually agreed that by submitting a proposal the bidder acknowledges that he has satisfied himself as to the feasibility and correctness of the plans, drawings and specifications for the construction of the work; that he accepts all the terms and stipulations contained therein; and that he is prepared to work in peace and harmony with other Contractors performing work on the site. No verbal agreement or conversation with any officer, agent or employee of the Owner, or with the Owner himself either before or after the execution of this Contract, shall affect or modify any of the terms or obligations herein contained.
* * * * * *
6. CONTRACTOR TO PROTECT, DEFEND, INDEMNIFY AND HOLD OWNER HARMLESS. The Contractor shall protect, defend, indemnify and hold harmless the Owner and the Owner's officers, agents, servants, employees or other duly authorized representatives of the Owner, hereinafter called the "Owner" from all suits, actions or claims of any character and all expenses incidental to the defense of such suits, actions or claims, based upon or arising out of: (1) any injury, disease, sickness or death of any person or persons, (2) any damages to any property, including in part loss of use thereof, caused by the Contractor, any subcontractor of the Contractor, or by their respective officers, agents, servants, employees or anyone else under the Contractor's direction and supervision, and arising out of, in connection with or relating to the performance of any work called for by this contract or from conditions created by the performance of said work.
Other pertinent provisions were cited in the state court opinion quoted previously.
In construing these contractual provisions the Court is mindful that "`[t]he rules governing the requisites, validity and construction of contracts generally apply to indemnity contracts.'" Northern Natural Gas Company v. Roth Packing Company, *396 323 F.2d 922, 926 (8th Cir. 1963) (Iowa law). The Court also notes that, under Iowa law, an indemnity clause need not expressly specify that the indemnitor will indemnify for the indemnitee's negligence if the clear intent of the contractual language is to provide coverage for the indemnitee's, as well as the indemnitor's, negligence. Northern Natural Gas Company v. Roth Packing Company, supra; Epley v. S. Patti Construction Company, supra; Weik v. Ace Rents, Inc., 249 Iowa 510, 87 N.W.2d 314 (1958). The Court therefore concludes that the indemnity clause in this case was intended to indemnify First Federal for negligent acts committed by Hawkins or First Federal.
This case, however, presents the novel question of whether an indemnitor, having agreed to indemnify for the indemnitee's negligent acts, can be required to indemnify for negligent acts of the indemnitee committed prior to the execution of the contract. The answer lies within a strict reading of the contractual provisions because "[t]he Courts have always held that it is not within their province to write or rewrite the provisions of a contract and that the parties are free to make their own contractual arrangements. . . . The provisions of a validly consummated contract will be enforced according to its terms." Chicago Great Western Ry. Co. v. Farmers Produce Co., supra, 164 F.Supp. at 541.
The Court after carefully considering the contract provisions, the relative positions of the parties, and the state court findings, concludes that the plaintiffs are not entitled to equitable contribution due to their paramount contractual duty to indemnify First Federal. Hawkins conducted an extensive inspection, including photographs taken of the Wollman Building, of the worksite prior to execution of the contract. By the patent terms of the contract, Hawkins agreed to accept the construction site, with all defects and attendant potential for liability, as it existed on August 10, 1967. The state court found that pile-driving is a hazardous activity, and that Hawkins was knowledgeable and possessed some expertise in this activity. These factors would strongly indicate to the Court that the parties intended Hawkins, with its superior knowledge of the activity, to shoulder the burden for potential liability. In summation, the Court believes the contract language quoted above, especially Paragraph 1, would have no meaning or serve no purpose other than to free First Federal from any liability if it was not intended by the parties to relieve First Federal of liability under all circumstances, including those contributed to by its own negligence prior to the contract. Cf. Northern Natural Gas Company v. Roth Packing Company, supra.

B. COMMON LAW INDEMNITY
Alternatively, First Federal contends it is entitled to indemnity protection on a theory of common law or implied indemnity.
Under Iowa law, common law indemnification arises in a number of circumstances. See Furnish, Distributing Tort Liability: Contribution and Indemnity in Iowa, 52 Iowa L.Rev. 31, 34-35 (1966) [hereinafter cited as Furnish, Distributing Tort Liability]. In Peters v. Lyons, 168 N.W.2d 759, 767 (Iowa 1969), the Iowa Supreme Court, quoting from Epley v. S. Patti Construction Company, supra, stated:
Generally, four different situations have been recognized which, if found to exist, will allow one negligent person to be indemnified by another notwithstanding any contract for indemnity:
(1) Where the one seeking indemnity has only a derivative or vicarious liability for damage caused by the one sought to be charged.
(2) Where the one seeking indemnity has incurred liability by action at the direction, in the interest of and in reliance upon the one sought to be charged. Restatement Restitution, Sec. 90.
(3) Where the one seeking indemnity has incurred liability because of a breach of duty owed to him by the one sought to be charged.

*397 (4) Where the one seeking indemnity has incurred liability merely because of failure, even though negligent, to discover or prevent the misconduct of the one sought to be charged.
The Iowa court has accepted this doctrine of indemnity.
Additionally, the courts have permitted indemnity where the indemnitor's acts of negligence constituted "active or primary" negligence as compared to the indemnitee's "passive or secondary" negligence. See Chicago & N. W. Ry. v. Chicago, R. I. & P. R.R., 179 F.Supp. 33, 63 (N.D.Iowa 1959); Iowa Power and Light Company v. Abild Construction Company, 259 Iowa 314, 144 N.W.2d 303 (1966); Furnish, Distributing Tort Liability, supra, at 47; 41 Am.Jur.2d, Indemnity, §§ 20, 24 (1968).
It is apparent in this case, and the state court so found, that Hawkins breached a duty to First Federal and thereby exposed First Federal to liability. This duty required Hawkins to protect adjacent buildings from the deleterious effects of excavation and pile-driving activities. See Stowe v. Wood, supra.
Furthermore, a thoughtful reading of the state court's factual findings requires the Court to conclude that Hawkins' active and primary, as opposed to the passive and secondary negligence of First Federal, occasioned the damage to the Wollman Building. See McCarthy v. J. P. Cullen & Son Corp., 199 N.W.2d 362 (Iowa 1972); Weidert v. Monahan Post Legionnaire Club, 243 Iowa 643, 51 N.W.2d 400 (1952); cf. Hathaway v. Sioux City, 244 Iowa 508, 57 N.W.2d 228, 239 (1953). The state court opinion is replete with references to Hawkins' commission of the "substantial" and "very serious" damage to the Wollman Building.
The Court therefore holds First Federal is entitled to complete indemnification from the damages awarded in the state court proceeding, and the plaintiffs are not entitled to contribution.
In regard to the plaintiffs' claim for contribution, the Court, on the strength of the state court's factual findings, concludes that this case does not present a situation justifying equitable contribution. Hawkins was the primary wrongdoer in the chain of events culminating in the state court judgment. Therefore, the parties were not, as plaintiffs contend, in pari delicto; and, under the facts of this case, to permit the plaintiffs recovery on a contribution theory would be inequitable. See Chicago & N. W. Ry. v. Chicago, R. I & P. R. R., supra.

C. ATTORNEYS' FEES AND COSTS
Plaintiffs also request contribution for attorneys' fees and costs in defending the state court action.
The Court, however, concludes that due to the indemnity provision in the parties' contract and Hawkins' acts of active and primary negligence, the plaintiffs are not entitled to contribution of attorneys' fees and costs. See Epley v. S. Patti Construction Company, supra; Peters v. Lyons, supra.
Accordingly, IT IS HEREBY ORDERED that judgment be entered for the defendant, and that the plaintiffs' cause of action is dismissed.

ON MOTION TO VACATE
Plaintiffs have filed a motion to set aside the Court's Memorandum and Order of June 1, 1976, to vacate the judgment entered June 2, 1976, and to grant a new trial. F.R.Civ.P. 59.
In particular, the plaintiffs contend the Court's ruling with respect to the issue of contractual indemnity is contrary to law and the evidence. The Court disagrees and, for purposes of clarifying any possible misunderstanding, reiterates the basis of its holding on this issue. In construing the retroactive application of indemnity contract clauses, the general rule, as espoused by the Iowa Supreme Court in Evans v. Howard R. Green Co., 231 N.W.2d 907 (1975), provides that:
"Usually a contract of indemnity covers only losses or liabilities which are incurred after the execution of the contract, *398 and not a loss or liability which had been incurred prior to the execution of the contract, unless it plainly manifests an intention, not to be limited to future losses or liabilities, but also to cover past transactions and existing losses or liabilities." Id. at 916-17, quoting from 42 C.J.S. Indemnity § 12b, page 581.
However, under the particular facts of that case, the Evans court found "[t]here is nothing to suggest the [indemnity] provision was intended to indemnify for any past negligent acts of the city's engineer architect in designing the project which might result in future accidents such as the one which later precipitated these suits." Id. at 916.
In the instant case, however, the contract provisions, notably ¶ 1, evince an obligation undertaken by the plaintiffs to assume full responsibility for the condition of the worksite on the contract date. These provisions, coupled with the relative relationship of the parties, manifest the parties' intention that the plaintiffs would indemnify for any past negligence by the defendant relating to the worksite condition.
The remaining contentions in the plaintiffs' motion are equally meritless, and the motion, in its entirety, should be overruled.
IT IS SO ORDERED.
NOTES
[1] Hawkins and Aetna retained the services of Emmet Tinley, Esq., a distinguished member of the Iowa Bar. At that time, Mr. Tinley was a member of First Federal's board of directors. This fact was made evident to Hawkins and Aetna at the inception of the state proceeding, and all parties agreed that no conflict of interest was apparent.
[2] Due to its ruling in this case, the Court need not consider defendants' estoppel argument.